UNITED STATES BANKRUPTCY COURT FOR
THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

IN RE:

CASE NO. 6:18-bk-02188-KSJ

BRUCE W. TILLEY                                CHAPTER 7

       Debtor

_____/

## CREDITOR'S MOTION FOR RELIEF FROM AUTOMATIC STAY

*Subject Property*: 154 Fort Smith Boulevard, Deltona, FL 32738

---

**NOTICE OF OPPORTUNITY TO
OBJECT AND FOR HEARING**

      **Pursuant to Local Rule 2002-4, the Court will consider the relief requested in this paper without further notice or hearing unless a party in interest files a response within 21 days from the date set forth on the attached proof of service, plus an additional three days for service if any party was served by U.S. Mail.**

      **If you object to the relief requested in this paper, you must file a response with the Clerk of the Court at 400 West Washington Street, Orlando, FL 32801 and serve a copy on the movant's attorney, 1428 Brickell Avenue, Suite 600, Miami, FL 33131, and any other appropriate persons within the time allowed. If you file and serve a response within the time permitted, the Court will either schedule and notify you of a hearing or consider the response and grant or deny the relief requested without a hearing.**

      **If you do not file a response within the time permitted, the Court will consider that you do not oppose the relief requested in the paper, will proceed to consider the paper without further notice or hearing, and may grant the relief requested.**

---

Creditor  Deutsche Bank National Trust Company, as Trustee, in trust for the registered holders of Morgan Stanley ABS Capital I Inc. Trust 2006-HE8, Mortgage Pass-Through Certificates, Series 2006 HE8, ("Creditor"), by and through undersigned counsel and pursuant to 11 U.S.C. §362(d), Fed. Rule Bankr. P. 4001 moves this Court for relief from the automatic stay to proceed in rem, and states:

12075.512

1.      This Court has jurisdiction over the subject matter herein.

2.      On or about June 29, 2006, Bruce W. Tilley and Catherine A. Tilley executed and delivered a promissory note (the "Note"), and a mortgage securing payment of the Note (the "Mortgage"). Creditor is entitled to enforce the Note, a true and correct copy of which is attached hereto as Exhibit "A".

3.      The Mortgage was recorded on July 17, 2006 in the Official Records, Book 5874 at Page 2436 of the Public Records of Volusia County, Florida and encumbered the property described in the Mortgage. A true and correct copy of the Mortgage is attached hereto as Exhibit "B". The Creditor is a secured creditor through the Note and Mortgage executed on June 29, 2006 in the amount of $209,000.00.

4.      The Mortgage was subsequently assigned to Deutsche Bank National Trust Company, as Trustee, in trust for the registered holders of Morgan Stanley ABS Capital I Inc. Trust 2006-HE8, Mortgage Pass-Through Certificates, Series 2006 HE8, by virtue of an assignment of mortgage (the "Assignment of Mortgage") recorded on June 17, 2011, in the Official Records Book 6602, at 4713 of the Public Records of Volusia County, Florida. A true and correct copy of the Assignment of Mortgage is attached hereto as Exhibit "C".

5.      The loan was subsequently modified pursuant to the Loan Modification Agreement, a true and correct copy of which is attached hereto as Exhibit "D".

6.      Select Portfolio Servicing, Inc. is the servicer of the loan described in the Note and Mortgage and, as such, has the authority to initiate the instant action and any foreclosure on the Creditor's behalf pursuant to a Power of Attorney, attached hereto as Exhibit "E".

7.      The Creditor has the right to foreclose on the subject property.

8.      Bruce W. Tilley and Catherine A. Tilley ("Debtor") are in default under the Note and Mortgage and are not adequately protecting the Creditor.

12075.512

9.      The Debtor filed this voluntary Chapter 7 proceeding on April 17, 2018.

10.     The Creditor holds a security interest in the subject property located: 154 Fort

Smith Boulevard, Deltona, FL 32738  ("Property"), more fully described in the Mortgage

attached as Exhibit "B". The legal description for the Property is as follows:

**LOT 12, BLOCK 1175, DELTONA, LAKES UNIT FORTY TWO, ACCORDING TO THE PLAT THEROF, RECORDED IN MAP BOOK 27, AT PAGES 262, OF THE PUBLIC RECORDS OF VOLUSIA COUNTY, FLORIDA.**

11.     Based on the Debtor's schedules, the Property is being surrendered. See Exhibit

"F" attached. Pursuant to the valuation, attached hereto as Exhibit "G", the property is valued at

$146,129.00.

12.     The amount due to the Creditor as of May 04, 2018 is $268,075.57, as evidenced

by Exhibit "H" attached. The amount due exceeds the Property's value as stated above, so there

is no equity in the Property.

13.     The Creditor maintains that cause exists pursuant to 11 U.S.C. §362(d)(1) for the

automatic stay to be lifted. The Creditor's security interest in the subject property is being

significantly jeopardized by the Debtors' failure to make regular payments under the Note and

Mortgage while Creditor is prohibited from pursuing lawful remedies to protect such interest.

The default is based on the contractual default. The contractual monthly mortgage payment is

$1,076.62 which is comprised of principal and interest, as well as escrow, if applicable. The

Debtor is indebted to the Creditor in the total amount of $268,075.57. See Exhibit "H" attached.

14.     Creditor further seeks relief to, at its option, offer, provide, and enter into any

potential loan assistance agreement. Creditor requests that it may contact the Debtor via

telephone or written correspondence to offer such an agreement.

15.     Select Portfolio Servicing, Inc. is servicing the loan on behalf of the Creditor. Any

payments made to the Creditor must be sent to:

12075.512

Select Portfolio Servicing, Inc.
Attn: Remittance Processing
P.O. Box 65450, Salt Lake City, UT 84165-0450

15.     Creditor hereby waives the requirement under §362(e) that a hearing be held

within 30 days of filing the Motion for Relief from the Automatic

Stay.

16.     Creditor respectfully requests that the Court waive the fourteen (14) day stay of

the order granting relief pursuant to Fed. Rule Bankr. P. 4001 (a)(3), so that Creditor can pursue

its in rem remedies without further delay.

WHEREFORE, Creditor, Deutsche Bank National Trust Company, as Trustee, in trust for the

registered holders of Morgan Stanley ABS Capital I Inc. Trust 2006-HE8, Mortgage Pass-

Through Certificates, Series 2006 HE8, prays that this Court issue an order terminating or

modifying the stay, and that the fourteen (14) day stay of the order pursuant to Fed. Rule Bankr.

P. 4001 (a)(3) be waived or, in the alternative, that the Debtor(s) be directed forthwith to make

regular cash payments that would adequately protect Creditor's interest. Additionally,

Creditor requests this Court award any other relief this Court deems just and proper.

Dated: May 30, 2018

**Heller & Zion, L.L.P.**
Attorneys for Movant
1428 Brickell Avenue, Suite 600
Miami, FL 33131
Telephone: (305) 373-8001
Facsimile: (305) 373-8030
Designated Email: mail@hellerzion.com


By:___/s/ Alexandra J. Sanchez, Esquire___
         Alexandra J. Sanchez, Esquire
         Florida Bar No. 154423

12075.512

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing Motion for Relief

from Automatic Stay was served by CM/ECF system for all CM/ECF participants or first class

U.S. Mail on the following persons or entities at the addresses listed:

Bruce W Tilley
154 Fortsmith Blvd.
Deltona, FL 32738

Michael P Kelton, Esq.
Paul & Elkind, PA
142 East New York Avenue
DeLand, FL 32724
Email: mkelton@paulandelkind.com

Trustee
Arvind Mahendru
5703 Red Bug Lake Road
Suite 284
Winter Springs, FL 32708

U.S. Trustee
United States Trustee - ORL7/13
Office of the United States Trustee
George C Young Federal Building
400 West Washington Street, Suite 1100
Orlando, FL 32801

Dated: May 30, 2018

**Heller & Zion, L.L.P.**
Attorneys for Secured Creditor
1428 Brickell Avenue, Suite 600
Miami, FL 33131
Telephone: (305) 373-8001
Facsimile: (305) 373-8030

By:____/s/ Alexandra J. Sanchez, Esquire____
        Alexandra J. Sanchez, Esquire
        Florida Bar No. 154423

12075.512

UNITED STATES BANKRUPTCY COURT FOR
THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

IN RE:

                                 CASE NO. 6:18-bk-02188-KSJ

BRUCE W. TILLEY                  CHAPTER 7

      Debtor

_____/

**AFFIDAVIT AS TO SURRENDERED PROPERTY**

STATE OF FLORIDA         )
                                 )
COUNTY OF MIAMI-DADE    )

BEFORE ME, this day personally appeared Alexandra J. Sanchez, Esquire, of Heller & Zion, LLP, who is personally known to me and who did take an oath, deposes and says:

1. I am counsel for Creditor  Deutsche Bank National Trust Company, as Trustee, in trust for the registered holders of Morgan Stanley ABS Capital I Inc. Trust 2006-HE8, Mortgage Pass-Through Certificates, Series 2006 HE8 ("Secured Creditor") in the above styled case.

2. This affidavit is being filed in support of the Amended Motion for Relief from stay filed in the case by Secured Creditor.

3. I have personally reviewed the Debtors' schedules filed in this case. Debtors state an intention to surrender the property located 154 Fort Smith Boulevard, Deltona, FL 32738 ("Real Property") to the Secured Creditor.

4. The Real Property is located in Volusia County, the legal description of the Property is set forth in the Mortgage, a copy of which is attached hereto, and such description is incorporated and made a part hereof by reference.

12075.512

CASE NO. 6:18-bk-02188-KSJ / Page 2 Affidavit as to Surrendered Property

5.  As of the date of the affidavit, I have examined the CM/ECF docket for this case and

have found no entries evidencing a contrary intent on the part of the Debtor.

FUTHER AFFIANT SAYETH NAUGHT.

_____
Alexandra J. Sanchez, Esquire
Florida Bar No. 154423
Heller & Zion, LLP

Dated: _May 7, 2018._

THE FOREGOING INSTRUMENT WAS SWORN AND SUBSCRIBED before me this

7th day of May, 2018 by Alexandra J. Sanchez, who is known to me and who did take an

oath.



_____
Notary Public

AYMET RAMOS
Notary Public - State of Florida
Commission # GG 038155
My Comm. Expires Oct 12, 2020
Bonded through National Notary Assn.

12075.512

When recorded return to :
Richmond Monroe Group
32 Jim Linegar LN
Branson West, MO. 65737
3PS

# InterestFirst℠ ADJUSTABLE RATE NOTE
(Six-Month LIBOR Index (As Published In *The Wall Street Journal*) - Rate Caps)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE AND FOR CHANGES IN MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

JUNE 29 , 2006          PLANTATION          FLORIDA
                        [City]              [State]

154 FORT SMITH BOULEVARD, DELTONA, FLORIDA 32738
[Property Address]

**1.   BORROWER'S PROMISE TO PAY**
In return for a loan that I have received, I promise to pay U.S. $209,000.00 (this amount is called "Principal"), plus interest, to the order of Lender. Lender is Decision One Mortgage Company, LLC. I will make all payments under this Note in the form of cash, check or money order.
I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.   INTEREST**
Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 6.39%. The interest rate I will pay may change in accordance with Section 4 of this Note.
The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3.   PAYMENTS**
(A) Time and Place of Payments
I will make a payment on the first day of every month, beginning on SEPTEMBER 1, 2006. Before the First Principal and Interest Payment Due Date as described in Section 4 of this Note, my payment will consist only of the interest due on the unpaid principal balance of this Note. Thereafter, I will pay principal and interest by making a payment every month as provided below.
I will make my monthly payments of principal and interest beginning on the First Principal and Interest Payment Due Date as described in Section 4 of this Note. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest, it will be applied to interest before Principal. If, on AUGUST 1, 2036, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
I will make my monthly payments at 6060 J.A. Jones Drive, Suite 1000, Charlotte, North Carolina 28287 or at a different place if required by the Note Holder.
(B) Amount of My Initial Monthly Payments
My monthly payment will be in the amount of U.S. $1,112.92 before the First Principal and Interest Payment Due Date, and thereafter will be in an amount sufficient to repay the principal and interest at the rate determined as described in Section 4 of this Note in substantially equal installments by the Maturity Date. The Note Holder will notify me prior to the date of change in monthly payment.
(C) Monthly Payment Changes
Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 or 5 of this Note.

**4.   ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**
(A) Change Dates
The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of AUGUST, 2008, and the adjustable interest rate I will pay may change on that day every 6th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."
(B) The Index
Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."
If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.
(C) Calculation of Changes
Before each Change Date, the Note Holder will calculate my new interest rate by adding FIVE AND 39/100THS percentage points (5.39%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.
The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.
(D) Limits on Interest Rate Changes
The interest rate I am required to pay at the first Change Date will not be greater than 9.39% or less than 6.39%. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than ONE percentage point(s) (1%) from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than 12.39% or less than 6.39%.

FLORIDA InterestFirst ADJUSTABLE RATE NOTE—SIX-MONTH LIBOR INDEX—Single Family

(page 1 of 3 pages)

EXHIBIT A

**(E)  Effective Date of Changes**

My  new  interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning  on  the  first  monthly  payment  date  after  the  Change  Date  until  the  amount  of  my  monthly  payment  changes again.

**(F)  Notice of Changes**

Before  the  effective  date  of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G)  Date of First Principal and Interest Payment**

The  date  of  my  first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be the first monthly payment date after AUGUST 1, 2011.

**5.  BORROWER'S RIGHT TO PREPAY**

I  have the right to make payments of principal at any time before they are due. A payment of principal only is known as  a  "Prepayment."  When  I  make  a  Prepayment,  I  will  tell  the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I  may  make  a  full  Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my  Prepayments  to  reduce the amount of principal that I owe under this Note.  However, the Note Holder may apply my Prepayment  to  the  accrued  and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the principal  amount  of  the  Note.  If  I  make  a  partial Prepayment, there will be no changes in the due date of my monthly payment  unless  the  Note  Holder  agrees in writing to those changes. If the partial Prepayment is made during the period when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the  term  when  my  payments  consist  only  of  interest.  If  the  partial  Prepayment  is  made during the period when my payments  consist  of  principal  and interest, my partial Prepayment may reduce the amount of my monthly payments after the  first  Change  Date  following  my  partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.  LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other  loan  charges  collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan  charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing  the  Principal  I  owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.  BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A)  Late Charges for Overdue Payments**

If  the  Note  Holder  has not received the full amount of any monthly payment by the end of FIFTEEN calendar days after  the  date  it  is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.0 % of my overdue payment  of  interest,  during  the  period  when my payment is interest only, and of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

**(B)  Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C)  Notice of Default**

If  I  am  in  default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by  a certain  date,  the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and  all  the  interest  that  I  owe  on  that  amount.  That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D)  No Waiver By Note Holder**

Even  if,  at  a  time  when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E)  Payment of Note Holder's Costs and Expenses**

If  the  Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to  be  paid  back  by  me  for  all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8.  GIVING OF NOTICES**

Unless  applicable  law requires a different method, any notice that must be given to me under this Note will be given by  delivering  it  or  by  mailing  it  by  first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless  the  Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will  be  given  by  mailing  it  by  first  class  mail  to  the  Note  Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.  OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If  more  than  one  person  signs  this Note, each person is fully and personally obligated to keep all of the promises made  in  this  Note,  including  the  promise  to  pay the full amount owed. Any person who is a guarantor, surety or endorser of  this  Note  is  also  obligated  to  do these things. Any person who takes over these obligations, including the obligations of a  guarantor,  surety  or  endorser  of  this  Note,  is  also obligated to keep all of the promises made in this Note. The Note Holder  may  enforce  its  rights  under  this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10.  WAIVERS**

I  and  any  other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment"  means  the  right  to  require  the  Note  Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

*(page 2 of 3 pages)*

11. **UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

(A) Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B) When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

12. **DOCUMENTARY TAX**

The state documentary tax due on this Note has been paid on the Mortgage securing this indebtedness.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
BRUCE W. TILLEY                           -Borrower

_____ (Seal)
CATHERINE A. TILLEY                       -Borrower

_____ (Seal)
                                          -Borrower

*[Sign Original Only]*

PAY TO THE ORDER OF

WITHOUT RECOURSE

DECISION ONE MORTGAGE COMPANY, LLC

BY: _____

Tiffany Stegall
Asst. Secretary

X

*(page 3 of 3 pages)*

## PREPAYMENT RIDER TO NOTE

THIS PREPAYMENT RIDER is made this ____29TH____ day of ____JUNE____, ____2006____, and is incorporated into and shall be deemed to amend and supplement the Note of the same date given by the undersigned (the "Borrower") in favor of Decision One Mortgage Company, LLC (the "Lender").

**5.  BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment". When I make a prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a partial prepayment without paying any prepayment charge. If I make a full prepayment within one (1) year of the date of this Note, I agree to pay a prepayment charge of 5% of the original principal amount of the loan; If I make a full prepayment more than one (1) year but within two (2) years of the date of this Note, I agree to pay a prepayment charge of 5% of the original principal amount of the loan. The Note Holder will use my prepayments to reduce the amount of principal that I owe under this Note. However, the Note Holder may apply my Prepayments to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes. My partial prepayment may reduce the amount of my monthly payments after the first Change Date following my partial prepayment. However, any reduction due to my partial prepayment may be offset by an interest rate increase.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Prepayment Rider.

_____ (Seal)
BRUCE W. TILLEY                                        -Borrower

_____ (Seal)
CATHERINE A. TILLEY                               -Borrower

_____ (Seal)
                                                               -Borrower

When recorded return to :
Richmond Monroe Group
32 Jim Linegar LN
Branson West, MO  65737
SPS #

**X**

FLORIDA PREPAYMENT RIDER - ADJUSTABLE RATE, FIRST MORTGAGE

## INTEREST-ONLY ADDENDUM
## TO ADJUSTABLE RATE PROMISSORY NOTE

Loan Number:
Property Address: 154 FORT SMITH BOULEVARD, DELTONA, FLORIDA 32738

THIS ADDENDUM is made this 29TH day of JUNE, 2006, and is incorporated into and intended to form a part of the Adjustable Rate Note (the "Note") dated the same date as the Addendum executed by the undersigned and payable to Decision One Mortgage Company, LLC (the Lender).

THIS ADDENDUM supersedes Section 3(A), 3(B), 4(C) and 7 (A) of the Note. None of the other provisions of the Note are changed by this Addendum.

### 3. PAYMENTS

(A)    Time and Place of Payments

I will pay interest by making payments every month for the first 60 payments (the "interest-only period") in the amount sufficient to pay interest as it accrues on the unpaid principal balance. I will pay principal and interest by making payments every month thereafter for the next 300 payment(s) in an amount sufficient to fully repay the unpaid principal balance of the Note at the end of the interest-only period in substantially equal monthly payments.

I will make my monthly payments on the 1ST day of each month beginning on SEPTEMBER 1, 2006.

I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its schedule due date and will be applied to interest before principal. If, on AUGUST 1, 2036, I still owe amounts under this Note, I will pay those amounts in full on that date which is called the "Maturity Date."

I will make my payments at 6060 J.A. Jones Drive, Suite 1000, Charlotte, North Carolina 28287 or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payment

Each of my initial monthly payments will be in the amount of U. S. $ 1,112.92. This payment amount is based on the original principal balance of the Note. This payment amount may change.

### 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

(C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding FIVE AND 39/100THS percentage points (5.39%) to the current index for such Change Date. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D), this rounded amount will be my new interest rate until the next Change Date.

During the interest-only period, the Note Holder will determine the amount of the monthly payment that would be sufficient to pay accrued interest on the unpaid principal balance. This will be the amount of my monthly payment until the earlier of the next Change Date or the end of the interest-only period unless I make a voluntary prepayment of principal during such period. If I make a voluntary prepayment of principal during the interest-only period, my payment amount for subsequent payments will be reduced to the amount necessary to pay interest at the then current interest rate on the lower unpaid principal balance.

Form 44

At the end of the interest-only period and on each Change Date thereafter, the Note Holder will determine the amount of the monthly payment that would be sufficient to repay in full the unpaid principal balance that I will owe in substantially equal monthly payments over the remaining term of the Note. The result of this calculation will be the new amount of my monthly payment. After the end of the interest-only period, my payment amount will not be adjusted due to voluntary principal payments until the next Change Date.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

(A)    Late Charge for Overdue Payments

If the Note Holder has not received the Full amount of any monthly payment by the end of FIFTEEN calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.0 % of my overdue payment of interest for the first payments, and 5.0 % of my overdue payment of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

Dated:  JUNE 29, 2006

_____ (Seal)
BRUCE W. TILLEY                              -Borrower

_____ (Seal)
CATHERINE A. TILLEY                          -Borrower

_____ (Seal)
                                            -Borrower

_____ (Seal)
                                            -Borrower

*[Sign Original Only]*

07/17/2006 08:40 AM
Doc stamps 731.50
Intangible Tax 418.00
Instrument# 2006-180295 # 1
**Book: 5874**
**Page: 2436**

DEED LABEL : hfstw3

TILLEY, BRUCE W       $209,000.00

Investor Name
       Morgan Stanley

Prepared by: KRISTIN NALEWAJEK
Decision One Mortgage Company, LLC
5201 W. KENNEDY BLVD, SUITE 600
TAMPA, FLORIDA 33609

After Recording Return To:
Decision One Mortgage Company, LLC
6060 J.A. Jones Drive, Suite 1000
Charlotte, North Carolina 28287

Status
Title NOT Received

Sold
No Date

——————— [Space Above This Line For Recording Data] ———————

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated JUNE 29, 2006, together with all Riders to this document.
(B) "Borrower" is BRUCE W TILLEYand CATHERINE A TILLEY, HUSBAND AND WIFE. Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(D) "Lender" is Decision One Mortgage Company, LLC. Lender is a LIMITED LIABILITY COMPANY organized and existing under the laws of NORTH CAROLINA. Lender's address is 6060 J.A. JONES DRIVE, SUITE 1000, CHARLOTTE, NORTH CAROLINA 28287.
(E) "Note" means the promissory note signed by Borrower and dated JUNE 29, 2006. The Note states that Borrower owes Lender TWO HUNDRED NINE THOUSAND AND 00/100ths Dollars (U.S.$209,000.00) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than AUGUST 1, 2036.
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☒ Adjustable Rate Rider    ☐ Condominium Rider              ☐ Second Home Rider
☐ Balloon Rider            ☐ Planned Unit Development Rider  ☐ Other(s) [specify]
☐ 1-4 Family Rider         ☐ Biweekly Payment Rider

FLORIDA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3010 1/01 (page 1 of 11 pages)

EXHIBIT  B

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) "Escrow Items" means those items that are described in Section 3.

(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. § 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the County _____ of ____VOLUSIA_____ :

   [Type of Recording Jurisdiction]     [Name of Recording Jurisdiction]

SEE ATTACHED SCHEDULE "A"

which currently has the address of __154 FORT SMITH BOULEVARD_____
                                [Street]

__DELTONA_____, Florida ____32738_____ ("Property Address"):
     [City]                     [Zip Code]

FLORIDA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT       Form 3010  1/01  *(page 2 of 11 pages)*

Instrument# 2006-180295 # 3
Book: 5874
Page: 2438

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance

Instrument# 2006-180295 # 4
Book:  5874
Page:  2439

premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    Form 3010  1/01  (page 4 of 11 pages)

Instrument# 2006-180295 # 5
Book: 5874
Page: 2440

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

Instrument# 2006-180295 # 6
Book:  5874
Page:  2441

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Instrument# 2008-180295 # 7
Book: 5874
Page: 2442

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan·as·agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their· risk, or reduce losses. These agreements are on terms and·conditions that are satisfactory to the mortgage ·insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any ·of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to ·the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking,·destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**FLORIDA**—Single Family—Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**             Form 3010 1/01 (page 8 of 11 pages)

Instrument# 2008-180295 # 9
Book: 5874
Page: 2444

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Instrument# 2008-180295 # 10
Book: 5874
Page: 2445

Neither Borrower nor Lender may commence; join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

25. **Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3010 1/01 *(page 10 of 11 pages)*

Instrument# 2006-180295 # 11
Book:  5874
Page:  2446

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

Please Print Name  *Mariette L. Sautter*

_____ (Seal)
**BRUCE W TILLEY**                     -Borrower

Please print your post office address

_____

_____

Please Print Name

_____ (Seal)
**CATHERINE A TILLEY**                 -Borrower

Please print your post office address

_____

_____

THE STATE OF  FLORIDA          )
COUNTY OF  Volusia             )

The foregoing instrument was acknowledged before me this   JUNE 29, 2006
by **BRUCE W TILLEY** and **CATHERINE A TILLEY, HUSBAND AND WIFE,** who is personally known to me or who has produced *Drivers Licenses* as identification.
*Work ID or Visa Card*

(Seal)

Notary Public
Typed or printed name *Mariette L. Sautter*
My Commission Expires:  *2-19-09*

MARIETTE L. SAUTTER
Notary Public - State of Florida
My Commission Expires Feb 19, 2009
Commission # DD 388020

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3010  1/01  *(page 11 of 11 pages)*



Instrument# 2006-180295 # 12
Book: 5874
Page: 2447

## LEGAL DESCRIPTION
### (TILLEY)

Lot 12, Block 1175, DELTONA LAKES UNIT FORTY TWO, according to the Plat thereof, recorded in Map Book 27, at Pages 262 through 266, of the Public Records of Volusia County, Florida.

EXHIBIT "A"

Instrument# 2008-180295 # 13
Book: 5874
Page: 2448

### INTEREST-ONLY ADDENDUM
### TO ADJUSTABLE RATE RIDER

Loan Number:
Property Address: 154 FORT SMITH BOULEVARD, DELTONA, FLORIDA 32738

THIS ADDENDUM is made this 29TH day of JUNE, 2006, and is incorporated into and intended to form a part of the Adjustable Rate Rider (the "Rider") dated the same date as the Addendum executed by the undersigned and payable to Decision One Mortgage Company, LLC (the Lender).

THIS ADDENDUM supersedes Section 4(C) of the Rider. None of the other provisions of the Note are changed by this Addendum.

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding FIVE AND 39/100THS percentage points (5.39%) to the current index for such Change Date. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D), this rounded amount will be my new interest rate until the next Change Date.

During first five (5) years after loan closing ("interest-only period"), the Note Holder will determine the amount of the monthly payment that would be sufficient to pay accrued interest on the unpaid principal balance. This will be the amount of my monthly payment until the earlier of the next Change Date or the end of the interest-only period unless I make a voluntary prepayment of principal during such period. If I make a voluntary prepayment of principal during the interest-only period, my payment amount for subsequent payments will be reduced to the amount necessary to pay interest at the then current interest rate on the lower unpaid principal balance.

At the end of the interest-only period and on each Change Date thereafter, the Note Holder will determine the amount of the monthly payment that would be sufficient to repay in full the unpaid principal balance that I am expected to owe in substantially equal monthly payments over the remaining term of the Note. The result of this calculation will be the new amount of my monthly payment. After the end of the interest-only period, my payment amount will not be adjusted due to voluntary principal payments.

Dated: JUNE 29, 2006

_____ (Seal)
BRUCE W TILLEY                   Borrower

_____ (Seal)
CATHERINE A TILLEY               Borrower

04/02                    Page 1 of 1                    Form 45

Instrument# 2006-180295 # 14
Book: 5874
Page: 2449

## FIXED/ADJUSTABLE RATE RIDER
### (Six-Month LIBOR Index (As Published In *The Wall Street Journal*)--Rate Caps)

THIS FIXED/ADJUSTABLE RATE RIDER is made this 29TH day of JUNE, 2006, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to DECISION ONE MORTGAGE COMPANY, LLC ("Lender") of the same date and covering the property described in the Security Instrument and located at:

__154 FORT SMITH BOULEVARD, DELTONA, FLORIDA 32738__
[Property Address]

THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial fixed interest rate of 6.39%. The Note also provides for a change in the initial fixed rate to an adjustable interest rate, as follows:

4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES
(A) Change Dates
The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of AUGUST, 2008, and the adjustable interest rate I will pay may change on that day every 6TH month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

(B) The Index
Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

(C) Calculation of Changes
Before each Change Date, the Note Holder will calculate my new interest rate by adding FIVE AND 39/100THS percentage points (5.39%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D)  Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 9.39% or less than 6.39%. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than ONE percentage point(s) (1%) from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than 12.39% or less than 6.39%.

**(E)  Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F)  Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B.  TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

1.  Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2.  When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

MULTISTATE FIXED/ADJUSTABLE RATE RIDER--WSJ Six-Month LIBOR--Single Family

(page 2 of 3)

Instrument# 2006-160295 # 16
Book: 5874
Page: 2451
Diane M. Matousek
Volusia County, Clerk of Court

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_____ (Seal)
BRUCE W TILLEY                      -Borrower

_____ (Seal)
CATHERINE A TILLEY                  -Borrower

_____ (Seal)
                                    -Borrower

MULTISTATE FIXED/ADJUSTABLE RATE RIDER--WSJ Six-Month LIBOR--Single Family

(page 3 of 3)

06/17/2011 11:20 AM
Instrument# 2011-100710 # 1
Book: 6602
Page: 4713

Prepared by and return to:
Fran E. Zion, Esquire
Heller & Zion, LLP
4000 Hollywood Boulevard, Suite 675 S
Hollywood, FL 33021

## ASSIGNMENT OF MORTGAGE

**FOR GOOD AND VALUABLE CONSIDERATION**, the sufficiency of which is hereby

acknowledged, the undersigned, Mortgage Electronic Registration Systems, Inc. ("MERS") as nominee

for **DECISION ONE MORTGAGE COMPANY, LLC**, whose address is **6060 J.A. Jones Drive, Suite**

**1000, Charlotte, NC 28287 (ASSIGNOR)**, by these presents does convey, grant, sell, assign, transfer

and set over the described mortgage together with the certain note(s) described therein together with all

interest secured thereby, all liens, and any rights due or to become due thereon to **DEUTSCHE BANK**

**NATIONAL TRUST COMPANY, AS TRUSTEE FOR THE HOLDERS OF MORGAN STANLEY**

**ABS CAPITAL I INC., TRUST 2006-HE8, MORTGAGE PASS-THROUGH CERTIFICATES,**

**SERIES 2006-HE8** whose address is **1761 East Saint Andrew Place, Santa Ana, CA 92705-4934,**

(ASSIGNEE).

Said Mortgage was made by **BRUCE W TILLEY and CATHERINE A TILLEY** on June 29, 2006 and

was recorded in the Official Records of the Clerk of the Court of Volusia County, Florida, in Book 5874,

Page 2436 upon the property situated in said State and County as more fully described as:

LOT 12, BLOCK 1175, DELTONA LAKES UNIT FORTY TWO, ACCORDING TO THE PLAT

THEREOF, RECORDED IN MAP BOOK 27, AT PAGES 262 THROUGH 266, OF THE PUBLIC

RECORDS OF VOLUSIA COUNTY, FLORIDA.

Bruce W Tilley and Catherine A Tilley · 154 Fort Smith Blvd., Deltona, FL 32738 - Assignment of Mortgage –

EXHIBIT 

Instrument# 2011-100710 # 2
Book: 6602
Page: 4714
Diane M. Matousek
Volusia County, Clerk of Court

IN WITNESS WHEREOF, the Assignor herein has duly executed this assignment this _3rd_ day of _____ _June_ , 2011.

Mortgage Electronic Registration
Systems, Inc. ("MERS") as nominee for
DECISION ONE MORTGAGE
COMPANY, LLC

WITNESS: _____
Print Name: DANILO CUENCA

By: _____
Print Name: Mercedes Juilla
Title: Assistant Secretary

WITNESS: _____
Print Name: Yonde Crain

## ACKNOWLEDGMENT

State of _California_ )
County of _Ventura_ )

On _June 3, 2011_ before me _Jennie M. Kogak Notary Public_
(insert name and title of the officer)

personally appeared _Mercedes Juilla_ _____
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of _California_ that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

JENNIE M. KOGAK
Commission # 1864075
Notary Public - California
Los Angeles County
My Comm. Expires Oct 3, 2013

Signature _____ (Seal)

Bruce W Tilley and Catherine A Tilley - 154 Fort Smith Blvd., Deltona, FL 32738 - Assignment of Mortgage - 11826.940

*DIGIMAII*
*MAR 2 1 2014*

## HOME AFFORDABLE MODIFICATION AGREEMENT
### (Step Two of Two-Step Documentation Process)

Borrower ("I"):[1]  **BRUCE W TILLEY, CATHERINE A TILLEY**
Lender or Servicer ("Lender"): **Select Portfolio Servicing, Inc.**
Date of first lien mortgage, deed of trust, or security deed ("Mortgage") and Note ("Note"): **June 29, 2006**
Loan Number:
Property Address *[and Legal Description if recordation is necessary]* ("Property"):
    **154 FORT SMITH BLVD**
    **DELTONA, FL 92660-0000**

If my representations in Section 1 continue to be true in all material respects, then this Home Affordable Modification Agreement ("Agreement") will, as set forth in Section 3, amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage. The Mortgage and Note together, as they may previously have been amended, are referred to as the "Loan Documents." Capitalized terms used in this Agreement and not defined have the meaning given to them in Loan Documents.

I understand that after I sign and return two copies of this Agreement to the Lender, the Lender will send me a signed copy of this Agreement. This Agreement will not take effect unless the preconditions set forth in Section 2 have been satisfied.

1.    **My Representations and Covenants.** I certify, represent to Lender, covenant and agree:

    A.   I am experiencing a financial hardship, and as a result, (i) I am in default under the Loan Documents or default is imminent, and (ii) I do not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments now or in the near future

    B.   One of the borrowers signing this Agreement lives in the Property as a principal residence, and the Property has not been condemned;

    C.   There has been no impermissible change in the ownership of the Property since I signed the Loan Documents. A permissible change would be any transfer that the lender is required by law to allow, such as a transfer to add or remove a family member, spouse or domestic partner of the undersigned in the event of a death, divorce or marriage;

    D.   I have provided documentation for **all** income that I receive (and I understand that I am not required to disclose child support or alimony unless I chose to rely on such income when requesting to qualify for the Home Affordable Modification program ("Program"));

    E.   Under penalty of perjury, all documents and information I have provided to Lender in connection with this Agreement, including the documents and information regarding my eligibility for the Program, are true and correct;

    F.   If Lender requires me to obtain credit counseling in connection with the Program, I will do so; and

    G.   I have made or will make all payments required under a Trial Period Plan or Loan Workout Plan.

---

[1] If more than one Borrower or Mortgagor is executing this document, each is referred to as "I." For purposes of this document words signifying the singular (such as "I") shall include the plural (such as "we") and vice versa where appropriate.

**MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT– Single Family –Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3157.**

Deferred Principal Balance

EXHIBIT D

2.  **Acknowledgements and Preconditions to Modification.** I understand and acknowledge that:

    A.  If prior to the Modification Effective Date as set forth in Section 3 the Lender determines that any of my representations in Section 1 are no longer true and correct or any covenant in Section 1 has not been performed, the Loan Documents will not be modified and this Agreement will terminate. In that event, the Lender will have all of the rights and remedies provided by the Loan Documents; and

    B.  I understand that the Loan Documents will not be modified unless and until (i) the Lender accepts this Agreement by signing and returning a copy of it to me, and (ii) the Modification Effective Date (as defined in Section 3) has occurred. I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Agreement.

3.  **The Modification.** If my representations and covenants in Section 1 continue to be true in all material respects and all preconditions to the modification set forth in Section 2 have been met, the Loan Documents will automatically become modified on **February 1, 2014** (the "Modification Effective Date") and all unpaid late charges that remain unpaid will be waived. I understand that if I have failed to make any payments as a precondition to this modification under a workout plan or trial period plan, this modification will not take effect. The first modified payment will be due on **February 1, 2014**.

    A.  The Maturity Date will be: **August 1, 2036.**

    B.  The modified principal balance of my Note will include all amounts and arrearages that will be past due as of the Modification Effective Date (including unpaid and deferred interest, fees, escrow advances and other costs, but excluding unpaid late charges, collectively, Unpaid Amounts) less any amounts paid to the Lender but not previously credited to my Loan. The new principal balance of my Note will be **$232,211.22** (the "New Principal Balance"). The New Principal Balance will consist of two (2) parts: (i) an amount which will accrue interest at the Note rate shown below, and on my monthly statement as Interest Bearing Principal Balance and (ii) an amount which will not accrue interest, shown below, and on my monthly statement as Deferred Principal Balance.

**MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT**– Single Family –Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3157.

Deferred Principal Balance

C.  **$69,663.37** of the New Principal Balance shall be deferred (the Deferred Principal Balance) and I will not pay interest or make monthly payments on this amount.  The new Principal Balance less the Deferred Principal Balance shall be referred to as the Interest Bearing Principal Balance and this amount is **$162,547.85**. Interest at the rate of **5.125%** will begin to accrue on the Interest Bearing Principal Balance as of **January 1, 2014** and the first new monthly payment on the Interest Bearing Principal Balance will be due on **February 1, 2014**.  My payment schedule for the modified Loan is as follows:

| Years | Interest Rate | Interest Rate Change Date | Monthly Principal and Interest Payment Amount | Estimated Monthly Escrow Payment Amount* | Total Monthly Payment* | Payment Begins On | Number of Monthly Payments |
|---|---|---|---|---|---|---|---|
| 1-23 | 5.125% | 02/01/2014 | $797.30 | $347.85, may adjust periodically | $1,145.15, may adjust periodically | 02/01/2014 | 271 |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
| **A final balloon payment on the Interest Bearing Principal Balance of $110,078.65 is due on the Maturity Date.** | | | | | | | |

The Deferred Principal Balance of **$69,663.37** will be due as a balloon payment on the earlier of, payoff of the Interest Bearing Principal Balance, transfer of the property or on the Modified Maturity Date.  The above terms in this Section 3.C. shall supersede any provisions to the contrary in the Loan Documents, including but not limited to, provisions for an adjustable or step interest rate.

*The escrow payments may be adjusted periodically in accordance with applicable law and therefore my total monthly payment may change accordingly.

The above terms in this Section 3.C. shall supersede any provisions to the contrary in the Loan Documents, including but not limited to, provisions for an adjustable, step or simple interest rate.

I understand that, if I have a pay option adjustable rate mortgage loan, upon modification, the minimum monthly payment option, the interest-only or any other payment options will no longer be offered and that the monthly payments described in the above payment schedule for my modified Loan will be the minimum payment that will be due each month for the remaining term of the Loan. My modified Loan will not have a negative amortization feature that would allow me to pay less than the interest due resulting in any unpaid interest to be added to the outstanding principal balance.

D.  I will be in default if I do not comply with the terms of the Loan Documents, as modified by this Agreement.

E.  If a default rate of interest is permitted under the Loan Documents, then in the event of default under the Loan Documents, as amended, the interest that will be due will be the rate set forth in Section 3.C.

F.  I agree to pay in full the Deferred Principal Balance and any other amounts still owed under the Loan Documents by the earliest of:  (i) the date I sell or transfer an interest in the Property, (ii) the date I pay the entire Interest Bearing Principal Balance, or (iii) the Maturity Date.

**MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT**– Single Family –Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3157.

Deferred Principal Balance

G.  If I make a partial prepayment of Principal, the Lender may apply that partial prepayment first to any Deferred Principal Balance before applying such partial prepayment to other amounts due.

**MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT**– Single Family –Fannie Mae/Freddie Mac UNIFORM
**INSTRUMENT Form 3157.**

Deferred Principal Balance

·4. **Additional Agreements.** I agree to the following:

    A. That all persons who signed the Loan Documents or their authorized representative(s) have signed this Agreement, unless (i) a borrower or co-borrower is deceased; (ii) the borrower and co-borrower are divorced and the property has been transferred to one spouse in the divorce decree, the spouse who no longer has an interest in the property need not sign this Agreement (although the non-signing spouse may continue to be held liable for the obligation under the Loan Documents); or (iii) the Lender has waived this requirement in writing.

    B. That this Agreement shall supersede the terms of any modification, forbearance, Trial Period Plan or other Workout Plan that I previously entered into with Lender.

    C. To comply, except to the extent that they are modified by this Agreement, with all covenants, agreements, and requirements of Loan Documents including my agreement to make all payments of taxes, insurance premiums, assessments, Escrow Items, impounds, and all other payments, the amount of which may change periodically over the term of my Loan.

    D. **Funds for Escrow Items.** I will pay to Lender on the day payments are due under the Loan Documents as amended by this Agreement, until the Loan is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over the Mortgage as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under the Loan Documents; (d) mortgage insurance premiums, if any, or any sums payable to Lender in lieu of the payment of mortgage insurance premiums in accordance with the Loan Documents; and (e) any community association dues, fees, and assessments that Lender requires to be escrowed. These items are called "Escrow Items." I shall promptly furnish to Lender all notices of amounts to be paid under this Section 4.D. I shall pay Lender the Funds for Escrow Items unless Lender waives my obligation to pay the Funds for any or all Escrow Items. Lender may waive my obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, I shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. My obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in the Loan Documents, as the phrase "covenant and agreement" is used in the Loan Documents. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Lender may exercise its rights under the Loan Documents and this Agreement and pay such amount and I shall then be obligated to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with the Loan Documents, and, upon such revocation, I shall pay to Lender all Funds, and in such amounts, that are then required under this Section 4.D.

    Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under the Real Estate Settlement Procedures Act ("RESPA"), and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

    The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge me for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays me interest on the Funds and applicable law permits Lender to make such a charge. Unless an agreement is made in writing or applicable law requires interest to be paid on the Funds, Lender shall not be required to pay me any interest or earnings on the Funds. Lender and I can agree in writing, however, that interest shall be paid on the Funds. Lender shall provide me, without charge, an annual accounting of the Funds as required by RESPA.

Deferred Principal Balance

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to me for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify me as required by RESPA, and I shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify me as required by RESPA, and I shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by the Loan Documents, Lender shall promptly refund to me any Funds held by Lender.

E.  That the Loan Documents as modified by this Agreement are duly valid, binding agreements, enforceable in accordance with their terms and are hereby reaffirmed.

F.  That all terms and provisions of the Loan Documents, except as expressly modified by this Agreement, remain in full force and effect; nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents; and that except as otherwise specifically provided in, and as expressly modified by, this Agreement, the Lender and I will be bound by, and will comply with, all of the terms and conditions of the Loan Documents.

G.  That, as of the Modification Effective Date, notwithstanding any other provision of the Loan Documents, if all or any part of the Property or any interest in it is sold or transferred without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Mortgage. Lender shall not exercise this option if state or federal law, rules or regulations prohibit the exercise of such option as of the date of such sale or transfer. If Lender exercises this option, Lender shall give me notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which I must pay all sums secured by the Mortgage. If I fail to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Mortgage without further notice or demand on me.

H.  That, as of the Modification Effective Date, I understand that the Lender will only allow the transfer and assumption of the Loan, including this Agreement, to a transferee of my property as permitted under the Garn St. Germain Act, 12 U.S.C. Section 1701j-3. A buyer or transferee of the Property will not be permitted, under any other circumstance, to assume the Loan. Except as noted herein, this Agreement may not be assigned to, or assumed by, a buyer or transferee of the Property.

I.  That, as of the Modification Effective Date, if any provision in the Note or in any addendum or amendment to the Note allowed for the assessment of a penalty for full or partial prepayment of the Note, such provision is null and void.

J.  That, I will cooperate fully with Lender in obtaining any title endorsement(s), or similar title insurance product(s), and/or subordination agreement(s) that are necessary or required by the Lender's procedures to ensure that the modified mortgage loan is in first lien position and/or is fully enforceable upon modification and that if, under any circumstance and not withstanding anything else to the contrary in this Agreement, the Lender does not receive such title endorsement(s), title insurance product(s) and/or subordination agreement(s), then the terms of this Agreement will not become effective on the Modification Effective Date and the Agreement will be null and void.

K.  That I will execute such other documents as may be reasonably necessary to either (i) consummate the terms and conditions of this Agreement; or (ii) correct the terms and conditions of this Agreement if an error is detected after execution of this Agreement. I understand that either a corrected Agreement or a letter agreement containing the correction will be provided to me for my signature. At Lender's option, this Agreement will be void and of no legal effect upon notice of such error. If I elect not to sign any such corrective documentation, the terms of the original Loan Documents shall continue in full force and effect, such terms will not be modified by this Agreement, and I will not be eligible for a modification under the Home Affordable Modification program.

L.  Mortgage Electronic Registration Systems, Inc. ("MERS") is a separate corporation organized and existing under the laws of Delaware and has an address and telephone number of P.O. Box 2026,

**MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT**– Single Family –Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3157.

Deferred Principal Balance

Flint, MI 48501-2026, (888) 679-MERS. In cases where the loan has been registered with MERS who has only legal title to the interests granted by the borrower in the mortgage and who is acting solely as nominee for Lender and Lender's successors and assigns, MERS has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling the mortgage loan.

M. That Lender will collect and record personal information, including, but not limited to, my name, address, telephone number, social security number, credit score, income, payment history, government monitoring information, and information about account balances and activity. In addition, I understand and consent to the disclosure of my personal information and the terms of the Trial Period Plan and this Agreement by Lender to (i) the U.S. Department of the Treasury, (ii) Fannie Mae and Freddie Mac in connection with their responsibilities under the Home Affordability and Stability Plan; (iii) any investor, insurer, guarantor or servicer that owns, insures, guarantees or services my first lien or subordinate lien (if applicable) mortgage loan(s); (iv) companies that perform support services for the Home Affordable Modification Program and the Second Lien Modification Program; and (v) any HUD certified housing counselor.

N. That if any document related to the Loan Documents and/or this Agreement is lost, misplaced, misstated, inaccurately reflects the true and correct terms and conditions of the loan as modified, or is otherwise missing, I will comply with the Lender's request to execute, acknowledge, initial and deliver to the Lender any documentation the Lender deems necessary. If the Note is replaced, the Lender hereby indemnifies me against any loss associated with a demand on the Note. All documents the Lender requests of me under this Section 4.N. shall be referred to as "Documents." I agree to deliver the Documents within ten (10) days after I receive the Lender's written request for such replacement.

O. That the mortgage insurance premiums on my Loan, if applicable, may increase as a result of the capitalization which will result in a higher total monthly payment. Furthermore, the date on which I may request cancellation of mortgage insurance may change as a result of the New Principal Balance.

**BALLOON NOTICE.** THE TERM OF THE LOAN IS 271 MONTHS. AS A RESULT, YOU WILL BE REQUIRED TO REPAY THE ENTIRE PRINCIPAL BALANCE AND ANY ACCRUED INTEREST THEN OWING ON THE MATURITY DATE. THE LENDER HAS NO OBLIGATION TO REFINANCE THIS LOAN INCLUDING THE DEFERRED PRINCIPAL BALANCE AT THE END OF TERM. THEREFORE, YOU MAY BE REQUIRED TO REPAY THE LOAN OUT OF ASSETS YOU OWN OR YOU MAY HAVE TO FIND ANOTHER LENDER WILLING TO REFINANCE THE LOAN. ASSUMING ANOTHER LENDER REFINANCES THIS LOAN AT MATURITY, YOU WILL PROBABLY BE CHARGED INTEREST AT MARKET RATES PREVAILING AT THAT TIME AND SUCH RATES MAY BE HIGHER THAN THE INTEREST RATE PAID ON THIS LOAN. YOU MAY ALSO HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW MORTGAGE LOAN.

In Witness Whereof, the Lender and I have executed this Agreement.

Select Portfolio Servicing, Inc.

Heather Perkins-Canas
Document Control Officer

By: _____

JUL 2 3 2014
_____
Date

_____ (Seal)
BRUCE W TILLEY

3/19/14
Date

_____ (Seal)
CATHERINE A TILLEY

_____
Date

_____[Space Below This Line For Acknowledgement]_____

**MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT**– Single Family –Fannie Mae/Freddie Mac UNIFORM
INSTRUMENT Form 3157.

Deferred Principal Balance

GARY W. OTT
RECORDER, SALT LAKE COUNTY, UTAH
830 SELECT PORTFOLIO SERVICING
PO BOX 65250
SLC UT 84165
11863866
Book 10237 Pages 3222-3230
06/11/2014 12:00 PM 26.00

## LIMITED POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that Deutsche Bank National Trust Company, a national banking association organized and existing under the laws of the United States, and having its usual place of business at 1761 East St. Andrew Place, Santa Ana, California, 92705, as Trustee (the "Trustee") pursuant to Agreements listed on Exhibit A attached hereto (the "Agreements"), hereby constitutes and appoints the Select Portfolio Servicing, Inc. (the "Servicer"), by and through the Servicer's officers, the Trustee's true and lawful Attorney-in-Fact, in the Trustee's name, place and stead and for the Trustee's benefit, in connection with all mortgage loans serviced by the Servicer pursuant to the Agreements solely for the purpose of performing such acts and executing such documents in the name of the Trustee necessary and appropriate to effectuate the following enumerated transactions in respect of any of the mortgages or deeds of trust (the "Mortgages" and the "Deeds of Trust" respectively) and promissory notes secured thereby (the "Mortgage Notes") for which the undersigned is acting as Trustee for various certificateholders (whether the undersigned is named therein as mortgagee or beneficiary or has become mortgagee by virtue of endorsement of the Mortgage Note secured by any such Mortgage or Deed of Trust) and for which Select Portfolio Servicing, Inc., is acting as the Servicer.

This Appointment shall apply only to the following enumerated transactions and nothing herein or in the Agreement shall be construed to the contrary:

1. The modification or re-recording of a Mortgage or Deed of Trust, where said modification or re-recording is solely for the purpose of correcting the Mortgage or Deed of Trust to conform same to the original intent of the parties thereto or to correct title errors discovered after such title insurance was issued; provided that (i) said modification or re-recording, in either instance, does not adversely affect the lien of the Mortgage or Deed of Trust as insured and (ii) otherwise conforms to the provisions of the Agreement.

2. The subordination of the lien of a Mortgage or Deed of Trust to an easement in favor of a public utility company of a government agency or unit with powers of eminent domain; this section shall include, without limitation, the execution of partial satisfactions/releases, partial reconveyances or the execution or requests to trustees to accomplish same.

3. The conveyance of the properties to the mortgage insurer, or the closing of the title to the property to be acquired as real estate owned, or conveyance of title to real estate owned.

4. The completion of loan assumption agreements.

EXHIBIT E

5.   The full satisfaction/release of a Mortgage or Deed of Trust or full conveyance upon payment and discharge of all sums secured thereby, including, without limitation, cancellation of the related Mortgage Note.

6.   The assignment of any Mortgage or Deed of Trust and the related Mortgage Note, in connection with the repurchase of the mortgage loan secured and evidenced thereby.

7.   The full assignment of a Mortgage or Deed of Trust upon payment and discharge of all sums secured thereby in conjunction with the refinancing thereof, including, without limitation, the assignment of the related Mortgage Note.

8.   With respect to a Mortgage or Deed of Trust, the foreclosure, the taking of a deed in lieu of foreclosure, or the completion of judicial or non-judicial foreclosure or termination, cancellation or rescission of any such foreclosure, including, without limitation, any and all of the following acts:

   a.   the substitution of trustee(s) serving under a Deed of Trust, in accordance with state law and the Deed of Trust;

   b.   the preparation and issuance of statements of breach or non-performance;

   c.   the preparation and filing of notices of default and/or notices of sale;

   d.   the cancellation/rescission of notices of default and/or notices of sale;

   e.   the taking of deed in lieu of foreclosure; and

   f.   the preparation and execution of such other documents and performance of such other actions as may be necessary under the terms of the Mortgage, Deed of Trust or state law to expeditiously complete said transactions in paragraphs 8.a. through 8.e. above.

9.   With respect to the sale of property acquired through a foreclosure or deed-in lieu of foreclosure, including, without limitation, the execution of the following documentation:

   a.   listing agreements;
   b.   purchase and sale agreements;
   c.   grant/warranty/quit claim deeds or any other deed causing the transfer of title of the property to a party contracted to purchase same;
   d.   escrow instructions; and
   e.   any and all documents necessary to effect the transfer of property.

10. The modification or amendment of escrow agreements established for repairs to the mortgaged property or reserves for replacement of personal property.

The undersigned gives said Attorney-in-Fact full power and authority to execute such instruments and to do and perform all and every act and thing necessary and proper to carry into effect the power or powers granted by or under this Limited Power of Attorney as fully as the undersigned might or could do, and hereby does ratify and confirm to all that said Attorney-in-Fact shall be effective as of June 3, 2014.

This appointment is to be construed and interpreted as a limited power of attorney. The enumeration of specific items, rights, acts or powers herein is not intended to, nor does it give rise to, and it is not to be construed as a general power of attorney.

Nothing contained herein shall (i) limit in any manner any indemnification provided by the Servicer to the Trustee under the Agreement, or (ii) be construed to grant the Servicer the power to initiate or defend any suit, litigation or proceeding in the name of Deutsche Bank National Trust Company except as specifically provided for herein. If the Servicer receives any notice of suit, litigation or proceeding in the name of Deutsche Bank National Trust Company, then the Servicer shall promptly forward a copy of same to the Trustee.

This limited power of attorney is not intended to extend the powers granted to the Servicer under the Agreement or to allow the Servicer to take any action with respect to Mortgages, Deeds of Trust or Mortgage Notes not authorized by the Agreement.

The Servicer hereby agrees to indemnify and hold the Trustee and its directors, officers, employees and agents harmless from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever incurred by reason or result of or in connection with any misuse by the Servicer of the powers granted to it hereunder. In accepting this indemnity, the Trustee does not waive, but rather expressly reserves, any other indemnities available under the Agreement. Pursuant to the Agreement, the Trustee shall not be liable for the actions of the Servicer or any Subservicers under this Limited Power of Attorney. The foregoing indemnity shall survive the termination of this Limited Power of Attorney and the Agreement or the earlier resignation or removal of the Trustee under the Agreement.

This Limited Power of Attorney is entered into and shall be governed by the laws of the State of New York, without regard to conflicts of law principles of such state.

Third parties without actual notice may rely upon the exercise of the power granted under this Limited Power of Attorney; and may be satisfied that this Limited Power of Attorney shall continue in full force and effect and has not been revoked unless an instrument of revocation has been made in writing by the undersigned.

IN WITNESS WHEREOF, Deutsche Bank National Trust Company, as Trustee for the affixed Agreements listed on the Exhibit A, has caused its corporate seal to be hereto affixed and these presents to be signed and acknowledged in its name and behalf by a duly elected and authorized signatory this 3rd day of June 2014.

Deutsche Bank National Trust Company,
as Trustee

By: _____
Name:   Karlene G. Benvenuto
Title:   Assistant Vice President

Witness:

_____
Jenny Pilapil

Witness:

_____
Gisselle Picard

Prepared by:

_____
Name:   Alice Tatusian
Title:   Associate
Address:     Deutsche Bank National Trust Company
             1761 E. Saint Andrew Place
             Santa Ana, CA 92705

State of California}
County of Orange}

On June 3, 2014, before me, Melinda A. Pilcher, Notary Public, personally appeared Karlene G. Benvenuto, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her authorized capacity and that by her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

Witness my hand and official seal.

Notary signature

MELINDA A. PILCHER
Commission # 2067159
Notary Public - California
Orange County
My Comm. Expires May 4, 2018

1.      Pooling and Servicing Agreement, dated as of June 1, 2006 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Select Portfolio Servicing, Inc., successor servicer to Bank of America, N.A., successor servicer to BAC Home Loans Servicing, LP f/k/a Countrywide Home Loans Servicing LP, as Servicer, Wells Fargo Bank, National Association, as Servicer and Custodian, HomeQ Servicing Corporation, as Servicer, New Century Mortgage Corporation, as Servicer, NC Capital Corporation, as Responsible Party, WMC Mortgage Corp., as Responsible Party, Decision One Mortgage Company, LLC, as Responsible Party, LaSalle Bank National Association, as Custodian and Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley ABS Capital I Inc. Trust 2006-HE5 Mortgage Pass-Through Certificates, Series 2006-HE5**

2.      Pooling and Servicing Agreement, dated as of September 1, 2006 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Select Portfolio Servicing, Inc., successor servicer to Bank of America, N.A., successor servicer to BAC Home Loans Servicing, LP f/k/a Countrywide Home Loans Servicing LP,, as Servicer, Wells Fargo Bank, National Association, as Servicer and Custodian, New Century Mortgage Corporation, as Servicer, NC Capital Corporation, as Responsible Party, WMC Mortgage Corp., as Responsible Party, Decision One Mortgage Company, LLC, as Responsible Party, LaSalle Bank National Association, as Custodian and Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley ABS Capital I Inc. Trust 2006-HE6 Mortgage Pass-Through Certificates, Series 2006-HE6**

3.      Pooling and Servicing Agreement, dated as of October 1, 2006 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Select Portfolio Servicing, Inc., successor servicer to Bank of America, N.A., successor servicer to BAC Home Loans Servicing, LP f/k/a Countrywide Home Loans Servicing LP, as Servicer, New Century Mortgage Corporation, as Servicer, NC Capital Corporation, as Responsible Party, WMC Mortgage Corp., as Responsible Party, Decision One Mortgage Company, LLC, as Responsible Party, Wells Fargo Bank, National Association, as Custodian, LaSalle Bank National Association, as Custodian and Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley ABS Capital I Inc. Trust 2006-HE7 Mortgage Pass-Through Certificates, Series 2006-HE7**

4.      Pooling and Servicing Agreement, dated as of November 1, 2006 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Wells Fargo Bank, National Association, as Master Servicer, Securities Administrator and Custodian, Saxon Mortgage Services, Inc., as Servicer, Select Portfolio Servicing, Inc., successor servicer to Bank of America, N.A., successor servicer to BAC Home Loans Servicing, LP f/k/a Countrywide Home Loans Servicing LP,, as Servicer, New Century Mortgage Corporation, as Servicer, NC Capital Corporation, as Responsible Party, WMC Mortgage Corp., as Responsible Party, Decision One Mortgage Company, LLC, as Responsible Party, LaSalle Bank National Association, as Custodian and Deutsche Bank National Trust

Company, as Trustee, related to the **Morgan Stanley ABS Capital I Inc. Trust 2006-HE8 Mortgage Pass-Through Certificates, Series 2006-HE8**

5.      Pooling and Servicing Agreement, dated as of November 1, 2006 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Select Portfolio Servicing, Inc., successor servicer to Bank of America, N.A., successor servicer to BAC Home Loans Servicing, LP f/k/a Countrywide Home Loans Servicing LP, as Servicer, New Century Mortgage Corporation, as Servicer, NC Capital Corporation, as Responsible Party and Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley ABS Capital I Inc. Trust 2006-NC5 Mortgage Pass-Through Certificates, Series 2006-NC5**

6.      Pooling and Servicing Agreement, dated as of January 1, 2007 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Saxon Mortgage Services, Inc., as Servicer, Select Portfolio Servicing, Inc., successor servicer to Bank of America, N.A., successor servicer to BAC Home Loans Servicing, LP f/k/a Countrywide Home Loans Servicing LP, as Servicer, NC Capital Corporation, as Responsible Party, Decision One Mortgage Company, LLC, as Responsible Party, LaSalle Bank National Association, as Custodian and Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley ABS Capital I Inc. Trust 2007-HE1 Mortgage Pass-Through Certificates, Series 2007-HE1**

7.      Pooling and Servicing Agreement, dated as of February 1, 2007 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Saxon Mortgage Services, Inc., as Servicer, Select Portfolio Servicing, Inc., successor servicer to Bank of America, N.A., successor servicer to BAC Home Loans Servicing, LP f/k/a Countrywide Home Loans Servicing LP, as Servicer, Wells Fargo Bank, National Association, as Servicer and Custodian, New Century Mortgage Corporation, as Servicer, NC Capital Corporation, as Responsible Party, WMC Mortgage Corp., as Responsible Party, Decision One Mortgage Company, LLC, as Responsible Party, LaSalle Bank National Association, as Custodian and Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley ABS Capital I Inc. Trust 2007-HE2 Mortgage Pass-Through Certificates, Series 2007-HE2**

8.      Pooling and Servicing Agreement, dated as of February 1, 2007 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Saxon Mortgage Services, Inc., as Servicer, Select Portfolio Servicing, Inc., successor servicer to Bank of America, N.A., successor servicer to BAC Home Loans Servicing, LP f/k/a Countrywide Home Loans Servicing LP, as Servicer, NC Capital Corporation, as Responsible Party, Wells Fargo Bank, National Association, as Custodian and Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley ABS Capital I Inc. Trust 2007-HE3 Mortgage Pass-Through Certificates, Series 2007-HE3**

9.      Pooling and Servicing Agreement, dated as of April 1, 2007 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Wells Fargo Bank, National Association, as Master Servicer, Securities Administrator and Custodian, Saxon Mortgage Services, Inc., as Servicer, Select Portfolio Servicing, Inc., successor servicer to Bank of America, N.A., successor servicer to BAC Home Loans Servicing, LP f/k/a Countrywide Home Loans Servicing LP, as Servicer, WMC Mortgage Corp., as Responsible Party, Decision One Mortgage Company, LLC, as Responsible Party, LaSalle Bank National Association, as Custodian and Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley ABS Capital I Inc. Trust 2007-HE5 Mortgage Pass-Through Certificates, Series 2007-HE5**

10.     Pooling and Servicing Agreement, dated as of May 1, 2007 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Wells Fargo Bank, National Association, as Master Servicer, Securities Administrator, Servicer and Custodian, Saxon Mortgage Services, Inc., as Servicer, Select Portfolio Servicing, Inc., successor servicer to Bank of America, N.A., successor servicer to BAC Home Loans Servicing, LP f/k/a Countrywide Home Loans Servicing LP, as Servicer, WMC Mortgage Corp., as Responsible Party, Decision One Mortgage Company, LLC, as Responsible Party, LaSalle Bank National Association, as Custodian and Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley ABS Capital I Inc. Trust 2007-HE6 Mortgage Pass-Through Certificates, Series 2007-HE6**

11.     Pooling and Servicing Agreement, dated as of September 1, 2007 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Wells Fargo Bank, National Association, as Master Servicer, Securities Administrator, Servicer and Custodian, Saxon Mortgage Services, Inc., as Servicer, Select Portfolio Servicing, Inc., successor servicer to Bank of America, N.A., successor servicer to BAC Home Loans Servicing, LP f/k/a Countrywide Home Loans Servicing LP, as Servicer, LaSalle Bank National Association, as Custodian and Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley ABS Capital I Inc. Trust 2007-HE7 Mortgage Pass-Through Certificates, Series 2007-HE7**

12.     Pooling and Servicing Agreement, dated as of January 1, 2007 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Select Portfolio Servicing, Inc., successor servicer to Bank of America, N.A., successor servicer to BAC Home Loans Servicing, LP f/k/a Countrywide Home Loans Servicing LP, as Servicer, Saxon Mortgage Services, Inc., as Servicer, NC Capital Corporation, as Responsible Party and Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley ABS Capital I Inc. Trust 2007-NC1 Mortgage Pass-Through Certificates, Series 2007-NC1**

13.     Pooling and Servicing Agreement, dated as of April 1, 2007 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Wells Fargo Bank, National Association, as Master Servicer and Securities Administrator, Saxon Mortgage Services, Inc., as Servicer, Select Portfolio Servicing, Inc., successor servicer to Bank of America, N.A., successor servicer to BAC Home Loans Servicing, LP f/k/a Countrywide Home Loans Servicing LP, as Servicer, and Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley ABS Capital I Inc. Trust 2007-NC2 Mortgage Pass-Through Certificates, Series 2007-NC2**

14.     Pooling and Servicing Agreement, dated as of February 1, 2007 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Saxon Mortgage Services, Inc., as Servicer, Wells Fargo Bank, National Association, as Servicer and Custodian, Select Portfolio Servicing, Inc., successor servicer to Bank of America, N.A., successor servicer to BAC Home Loans Servicing, LP f/k/a Countrywide Home Loans Servicing LP,, as Servicer, First NLC Financial Services, LLC, as Responsible Party and Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley Home Equity Loan Trust 2007-1 Mortgage Pass Through Certificates, Series 2007-1**

15.     Pooling and Servicing Agreement, dated as of March 1, 2007 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Wells Fargo Bank, National Association, as Master Servicer, Securities Administrator and Servicer, Saxon Mortgage Services, Inc., as Servicer, Select Portfolio Servicing, Inc., successor servicer to Bank of America, N.A., successor servicer to BAC Home Loans Servicing, LP f/k/a Countrywide Home Loans Servicing LP, as Servicer, First NLC Financial Services, LLC, as Responsible Party and Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley Home Equity Loan Trust 2007-2 Mortgage Pass Through Certificates, Series 2007-2**

**Fill in this information to identify your case:**

| | | | |
|---|---|---|---|
| Debtor 1 | **Bruce W Tilley** | | |
| | First Name | Middle Name | Last Name |
| Debtor 2 | | | |
| (Spouse if, filing) | First Name | Middle Name | Last Name |

United States Bankruptcy Court for the:    MIDDLE DISTRICT OF FLORIDA

Case number
(if known)

☐ Check if this is an amended filing

## Official Form 108
# Statement of Intention for Individuals Filing Under Chapter 7     12/15

If you are an individual filing under chapter 7, you must fill out this form if:
■ creditors have claims secured by your property, or
■ you have leased personal property and the lease has not expired.
You must file this form with the court within 30 days after you file your bankruptcy petition or by the date set for the meeting of creditors, whichever is earlier, unless the court extends the time for cause. You must also send copies to the creditors and lessors you list on the form

If two married people are filing together in a joint case, both are equally responsible for supplying correct information. Both debtors must sign and date the form.

Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known).

**Part 1:    List Your Creditors Who Have Secured Claims**

1. For any creditors that you listed in Part 1 of Schedule D: Creditors Who Have Claims Secured by Property (Official Form 106D), fill in the information below.

| Identify the creditor and the property that is collateral | What do you intend to do with the property that secures a debt? | Did you claim the property as exempt on Schedule C? |
|---|---|---|
| Creditor's name: **Ally Financial** <br><br> Description of property securing debt: **2015 Kia Sorrento 47,000 miles VIN NO. 5XYKT4A7XFGG09716 Location: 154 Fortsmith Blvd., Deltona FL 32738** | ☐ Surrender the property. <br> ☐ Retain the property and redeem it. <br> ■ Retain the property and enter into a *Reaffirmation Agreement*. <br> ☐ Retain the property and [explain]: <br> _____ | ☐ No <br><br> ■ Yes |
| Creditor's name: **Select Portfolio Servicing** <br><br> Description of property securing debt: **154 Fortsmith Blvd. Deltona, FL 32738  Volusia County** | ■ Surrender the property. <br> ☐ Retain the property and redeem it. <br> ☐ Retain the property and enter into a *Reaffirmation Agreement*. <br> ☐ Retain the property and [explain]: <br> _____ | ■ No <br><br> ☐ Yes |

**Part 2:    List Your Unexpired Personal Property Leases**

For any unexpired personal property lease that you listed in Schedule G: Executory Contracts and Unexpired Leases (Official Form 106G), fill in the information below. Do not list real estate leases. Unexpired leases are leases that are still in effect; the lease period has not yet ended. You may assume an unexpired personal property lease if the trustee does not assume it. 11 U.S.C. § 365(p)(2).

| Describe your unexpired personal property leases | Will the lease be assumed? |
|---|---|

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com                                        Best Case Bankruptcy

EXHIBIT ___F___

Debtor 1    **Bruce W Tilley**                                    Case number *(if known)*

| Lessor's name: | ☐ No |
| Description of leased Property: | ☐ Yes |

| Lessor's name: | ☐ No |
| Description of leased Property: | ☐ Yes |

| Lessor's name: | ☐ No |
| Description of leased Property: | ☐ Yes |

| Lessor's name: | ☐ No |
| Description of leased Property: | ☐ Yes |

| Lessor's name: | ☐ No |
| Description of leased Property: | ☐ Yes |

| Lessor's name: | ☐ No |
| Description of leased Property: | ☐ Yes |

| Lessor's name: | ☐ No |
| Description of leased Property: | ☐ Yes |

**Part 3:    Sign Below**

Under penalty of perjury, I declare that I have indicated my intention about any property of my estate that secures a debt and any personal property that is subject to an unexpired lease.

X    **/s/ Bruce W Tilley**                                    X _____
     **Bruce W Tilley**                                            Signature of Debtor 2
     Signature of Debtor 1

     Date    **April 17, 2018**                                   Date _____

Official Form 108                    **Statement of Intention for Individuals Filing Under Chapter 7**                    page 2

Altkey: 2814080
TILLEY BRUCE W

Parcel ID: 813042160120
154 FORT SMITH BLVD , DELTONA

## Parcel

| | |
|---|---|
| Short Parcel Id | 813042160120 |
| Property Location | 154 FORT SMITH BLVD, DELTONA, 32738 |
| PC Code | 0100 - SINGLE FAMILY |
| Total Bldgs | 1 |
| Neighborhood | 5698 - DELTONA LAKES UNIT 62 |
| Business Name | |

## Primary Owner

| | |
|---|---|
| Owner | TILLEY BRUCE W |
| In Care Of | |
| Mailing Address | 154 FT SMITH BLVD |
| | DELTONA FL 32738 |

## All Owners

| # | Owner 1 | Owner 2 | Owner % | Owner Type(s) |
|---|---------|---------|---------|---------------|
| 0 | TILLEY BRUCE W | | 100 | FS - Fee Simple |

## Legal

| | |
|---|---|
| Millage Group | 016-DELTONA |
| Legal Description | LOT 12 BLK 1175 DELTONA LAKES UNIT 42 MB 27 PGS 262-266 INC PER OR 4066 PG 1473 PER OR 6851 PGS 0570-0571 |
| Map TWP-RNG-SEC | 18 - 31 - 30 |
| Subdivision-Block-Lot | 42 - 16 - 0120 |
| Date Created | 21-DEC-81 |
| Year Annexed | |

## Special Assessment

| Project # | Description | Units | Rate | Amount |
|-----------|-------------|-------|------|--------|
| 0161 | DELTONA GARBAGE | 1.00 | $173.96 | $173.96 |
| 0162 | DELTONA IMPV STRMWATER-RES | 1.00 | $108.00 | $108.00 |

## Sales

| Book/Page | Instr Type | Inst # | Sale Date | V/I | Sale Price |
|-----------|-----------|--------|-----------|-----|-----------|
| 6851 / 0570 | QC-QUIT CLAIM DEED | 2013082850 | 04/26/2013 | I | $100 |
| 4066 / 1473 | WD-WARRANTY DEED | 1995200602 | 12/15/1995 | I | $91,600 |
| 4042 / 1865 | WD-WARRANTY DEED | 1995148384 | 09/15/1995 | V | $10,400 |
| 2964 / 1745 | WD-WARRANTY DEED | | 08/15/1986 | V | $8,500 |
| 1776 / 1464 | WD-WARRANTY DEED | | 04/15/1975 | V | $1,800 |

## County Links

| | |
|---|---|
| Property Tax Bill | CLICK HERE |
| Link to Permits | CLICK HERE |

## Other Links

| | |
|---|---|
| Google Street Address | CLICK HERE |
| Bing Maps | CLICK HERE |

## Land & Agriculture

| # | Land Code | Type | Units | Acres | Sq Feet | FF | Depth | Rate | Just Value |
|---|-----------|------|-------|-------|---------|-----|-------|------|-----------|
| 1 | 0101-IMP PVD THRU .49 AC | FRONT FOOT | | .2583 | 11,250 | 90.0 | 125 | 150.00 | $11,205 |

EXHIBIT G

### Land Summary

| | |
|---|---|
| Land Code | 0101-IMP PVD THRU .49 AC |
| Total Land Value | $11,205 |
| Value/Square Feet | 1.00 |
| Value/Acre | 43,379.79 |
| Depth Factor | 1.00 |
| Location Factor | 100 |
| Influence 1 | -17 - Shape |
| Influence 2 | - |

### Total Land Value

| Total Land Value | $11,205 |
|---|---|

### AGVAL Summary

| | |
|---|---|
| AG Value | |
| Appraised Value | |
| Non AG Just Value | |
| Total Land Value | |

### Residential

| | |
|---|---|
| Card (Bldg) # | 1 |
| # Stories | 1 |
| Style | |
| Improvement Type | R1 - Single Family |
| Quality Grade | 300 |
| Year Built / Eff Year | 1995 / 2001 |
| Total SFLA | 1,736 |
| Exterior Wall | 17 - CONCRETE BLOCK STUCCO |
| Foundation | 3 - CONCRETE SLAB |
| HVAC | Y - AIR CONDITIONING |
| Floor Type | 14 - CARPET |
| Roof Type | 03 - GABLE |
| Roof Cover | 3 - ASPHALT SHINGLE |
| Wall Type | 5 - DRYWALL |
| Heat Source | 1 - ELECTRICITY |
| Heat Method | 6 - 6 |
| Bedrooms | 3 |
| 2 Fixture Baths | 0 |
| 3 Fixture Baths | 2 |
| 4 Fixture Baths | 0 |
| 5 Fixture Baths | 0 |
| 6 Fixture Baths | 0 |
| 7 Fixture Baths | 0 |
| Addl Fixtures | 0 |
| FPL: Stacks/Openings/Blt In | 1 / 1 / |
| Total Building Value | $134,924 |

### Additions to Base Area

| Building | Description | Year Built | Area |
|---|---|---|---|
| 1 | MAIN BUILDING | | 1,736 |
| 1 | Porch, Open Finished | | 190 |
| 1 | Unfinished Garage | | 400 |
| 1 | Porch, Open Finished | | 16 |

### Main Building Rates

| | Base Rate | Level Factor | Area Factor | Story Factor | Grade Factor | Const Factor | RCN Value |
|---|---|---|---|---|---|---|---|

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Base House | 78,685 | X | 1.000 | X | 1.385 | X | 1.000 | X | 1.020 | X | 1.000 | = | 111,159 |
| Foundation | 0 | X | 1.000 | X | 1.385 | X | 1.000 | X | 1.020 | X | 1.000 | = | 0 |
| HVAC | 0 | X | 1.000 | X | 1.385 | X | 1.000 | X | 1.020 | X | 1.000 | = | 0 |
| Attic | 0 | X | 1.000 | X | 1.385 | X | 1.000 | X | 1.020 | X | 1.000 | = | 0 |

Other Features

| | Rate | | SLF | | Units | | | Grade | | | | = | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 Story Fireplace | 3,772 | X | 1.000 | X | 1 | X | | 1.020 | X | | | = | 3,847 |
| 2 Story Fireplace | 0 | X | 1.000 | X | 0 | X | | 1.020 | X | | | = | 0 |

| | | Fireplace | | Plumbing | | Misc Value | | = | |
|---|---|---|---|---|---|---|---|---|---|
| Feature Totals | | 3,847 | + | 7,815 | + | 0 | | = | 11,662 |
| Building Subtotal | | | | | | | | | 122,821 |
| Points Factor | | | | | | | | | 1.000 |
| Base RCN | | | | | | | | | 158,230 |
| Sections RCN | | | | | | | | | 16,090 |
| Total RCN | | | | | | | | | 138,911 |

| | Phy | | Mkt | | Obs | | Ecn | | Fun | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Depreciation | .900 | X | .000 | X | .000 | X | .000 | X | .000 | X | | .900 |
| Base RCNLD | | | | | | | | | | | | 142,407 |
| Sections RCNLD | | | | | | | | | | | | 14,481 |
| Total RCNLD | | | | | | | | | | | | 156,888 |
| Nbhd Factor | | | | | | | | | | | | .860 |
| Final Value | | | | | | | | | | | | 134,924 |

**Working Tax Roll Values**

| Year | Land Value | Impr Value | Just Value | Non-Sch Assd | Non-Sch Exemptions | Non-Sch Taxable | HX Savings |
|---|---|---|---|---|---|---|---|
| 2018 | $11,205 | $134,924 | $146,129 | $69,079 | $44,079 | $25,000 | $77,050 |

**Previous Year Values**

| Year | Land Value | Impr Value | Just Value | Non-Sch Assd | Non-Sch Exemptions | Non-Sch Taxable | HX Savings |
|---|---|---|---|---|---|---|---|
| 2017 | $7,844 | $114,178 | $122,022 | $67,658 | $42,658 | $25,000 | $54,364 |
| 2016 | $7,097 | $96,452 | $103,549 | $66,266 | $41,266 | $25,000 | $37,283 |
| 2015 | $7,470 | $79,530 | $87,000 | $65,805 | $40,805 | $25,000 | $21,195 |
| 2014 | $8,591 | $67,515 | $76,106 | $65,283 | $40,283 | $25,000 | $10,823 |
| 2013 | $8,591 | $60,945 | $69,536 | $64,318 | $39,318 | $25,000 | $5,218 |
| 2012 | $7,470 | $55,773 | $63,243 | $63,243 | $38,243 | $25,000 | $0 |
| 2011 | $7,470 | $58,332 | $65,802 | $65,802 | $40,802 | $25,000 | $0 |
| 2010 | $12,699 | $76,059 | $88,758 | $88,758 | $50,000 | $38,758 | $0 |

**Permit Summary**

| Date | Number | Description | Amount | Open/Closed |
|---|---|---|---|---|
| 01/03/2005 | 0500084 | | $4,509 | C |
| 09/25/1995 | 19950913045 | SINGLE FAMILY-DETACH | $80,438 | C |

```
PAY4              AS-OF 05/07/18  PAYOFF CALCULATION TOTALS 05/04/18  12:37:44
NAME BW TILLEY   CONTACT NAME BRUCE W TILLEY
-------------------------------------------------------------------------------
PRINCIPAL BALANCE          230,286.75      ---- 1ST MORTGAGE RATE CHANGES ----
INTEREST 05/07/18           23,176.51      INT FROM    RATE       AMOUNT
PRO RATA MIP/PMI                  .00      07/01/15  5.12500     23,176.51
ESCROW ADVANCE               8,847.28      05/07/18
ESCROW BALANCE                    .00
SUSPENSE BALANCE                  .01-
HUD BALANCE                       .00
REPLACEMENT RESERVE               .00
RESTRICTED ESCROW                 .00
TOTAL-FEES                      24.94
ACCUM LATE CHARGES             398.60
ACCUM NSF CHARGES                 .00
OTHER FEES DUE                    .00
PENALTY INTEREST                  .00
FLAT/OTHER PENALTY FEE            .00      TOTAL 1ST MTG INTEREST  23,176.51
CR LIFE/ORIG FEE RBATE            .00      TOTAL TO PAYOFF        268,075.57
RECOVERABLE BALANCE          5,341.50  PRINT DISALLOWED:  NOT SIGNED ON TO OLLW

-------------------------------------------------------------------------------
```

EXHIBIT ___H___